Good morning. My name is Michael Richer. I represent the plaintiffs' appellants in this matter. I'd ask to reserve five minutes for rebuttal. Mr. Richer, before we get started too far, I want to get your understanding and your – basically your position. As you know, in King v. Maryland, the highest court in Maryland issued a ruling which I know you folks are pleased with. Immediately thereafter, the State sought a stay from the circuit justice, who happened to be Chief Justice John Roberts. He issued a chamber's opinion in which he stayed the application of the ruling by the State court, indicating, in quotes, there is a reasonable probability this court will grant certiorari. He cited Mitchell. He cited this case below. And the Virginia Supreme Court indicated, in quotes, collecting DNA from individuals arrested for violent felonies provides a valuable tool for investigating unsolved crimes and thereby helping remove violent offenders from the general population. And he finished by saying the split of the circuits in cases implicates an important feature of day-to-day law enforcement practice in approximately half the States in the Federal Government, and that, in quotes, given the considerable analysis of the courts on the other side of the split, there is a fair prospect that this court, meaning the United States Supreme Court, will reverse the Maryland decision. Given that fact, and the fact that the Supreme Court will, of course, again reconvene for its next session and will begin considering petitions for cert, is there any reason why we should move forward with at least a submission of this case until we know what the Supreme Court is going to do with respect to a grant of cert in King v. Maryland? What's your position on that? I think this Court should move forward for three separate reasons. First of all, this case has been in this Court for quite some time. I don't see that further delay is warranted. In addition, the Maryland case differs from this case in two critical aspects. First of all, the Maryland law does not require that the DNA be given and analyzed simply because of arrest. It only applies to those people who have actually been charged with a crime. In California, that would eliminate about 18 percent of the people who are arrested every year. So the Maryland law is narrower than this law. If the Supreme Court decides that case on narrow grounds, if it takes it, then that won't necessarily determine the issue here. Equally importantly, there is absolutely no record, no factual record in the Maryland case. And so I appreciate that it's important that Chief Justice Roberts said that this is an important law enforcement function. If you look at the evidence in this case, and we have evidence in the record from experts on both sides, from the head of the FBI's DNA program, from the head of California's DNA program, from Dr. Wallace. We have statistics from the State of California now before this Court. We have the RAND study, which, of course, the Supreme Court could also look at. The evidence in this case confirms that arrestee testing is not, in fact, as useful as the government would like people to believe. And apparently, as Chief Justice Roberts was convinced by the government's papers, which didn't cite any studies, didn't cite any evidence, because there is no evidence in that case. I appreciate your answer on that. I just have one other quick comment from my other colleague's comment. In this case, if this case is the one that goes forward, based on the circuit split with Mitchell and the third, District Judge Charles Breyer heard this case at the district court level, which means, of course, that based on precedent, his brother, Justice Stephen Breyer, will recuse himself. Are you sure you want this to be your test case? I don't know that I'm qualified to answer that question. This is the only civil case that addresses arrestee testing. This is the only case in the Federal system that has a complete factual record about the alleged costs and benefits of arrestee testing. Yes, I think this is the case. Even though Justice Breyer wrote the dissent in Florence? I'm puzzled. It will be up to the Supreme Court whether they take this case or any other case. Indeed. Okay. There really isn't any legal significance, though, to the fact that the Chief Justice granted that statement. Not in this case. Right. It's an indication from a single justice. Let me ask you about the difference between this statute and the one in Maryland. You said that if somebody is not charged with a crime in Maryland, the what is discarded? A swab is discarded or the test results or everything is discarded? The Maryland law prohibits the State from analyzing the DNA sample. So it allows them to take the sample. It prohibits them from searching the sample until after arraignment. So what happens to the sample as far as we know? I'm not asking you to make up anything. I'm just as far as the record in that case discloses what happens. Do they keep the sample for future reference? Do they have to discard it? Do you know? My understanding is that the sample is destroyed if there is no accusatory pleading filed. I'm not sure. Accusatory pleading, in our case, you have to be arrested for a felony in California. In Maryland, is that the same thing? You have to be arrested for a felony or does it apply to any arrest? The Maryland law applies only to a limited subset of crimes. I believe some of them are felonies, some of them are maybe misdemeanors. It applies to sex crimes, murder, aggravated assault. So what if you're arrested, but then you're swabbed, but then charged with a crime that's not one of the listed crimes? My understanding of the Maryland statute is that in that case the sample would not be tested. That what triggers the testing and the retention of the sample is the crime that you're being charged with. I'll be clear. I'm not entirely sure. Would you contrast that with the California setup, both in terms of the timing of testing and also the procedure for the return or destruction of samples? Absolutely. In California, everyone who's arrested is tested. Their sample is analyzed and put in the database. Of course, it takes a month for that to happen. No matter what the district attorney decides to do with the case after reviewing it, there doesn't need to be any judicial proceedings, no arraignments. In addition, here in California, there's no automatic expungement for anybody. And even for someone who's arrested but not charged in California, they can't get expungement if they have a prior, maybe a 20-year-old felony conviction. So the procedures are quite different, both for the timing, who gets tested. It's a much narrower group of people in Maryland because there are fewer crimes that they test for, not all felonies. You don't get tested for simple drug possession or writing a bad check in Maryland. And also, the expungement procedures are much more. I mean, that said, you, I think, will agree, though, that if it turns out the Supreme Court does grant cert in the Maryland case, what they say in that case will – I mean, how broad their right, whatever their right in that case, will bear significantly on our case as well. Don't you agree? I would certainly expect so, yes. Could I ask you a factual question? You talked about the record. I have two. One is, in the panel opinion, there was a dispute, and in the Justice Klein's opinion, there seems to be some factual assumption on parts of the – part of some of the judges is that there is no identification use made of the DNA samples in California, that it's essentially only for investigating purposes. And I take – that seems to be your – obviously your position. It is. Is there any evidence that there is absolutely no use made of these DNA samples to be compared to or to, say, the fingerprints, to verify in the narrow sense of identification that the person who is who the person claims to be? For example, we have cases in the immigration context, just to take an example, where the fingerprints are used to determine whether the person who presents himself or herself is actually the person that they claim to be. DNA in that situation might be a way to go beyond if fingerprints have been altered or whatever. DNA might be, arguably, a way to corroborate or disprove fingerprint evidence. Is there no such usage made of the DNA samples in California? The record in this case, as well as Justice Klein's unanimous opinion for the California Court of Appeal, shows that it is not being used for identification. It is only being used for investigation. The record in this case contains a complete description of how DNA samples, arrestee DNA samples are being used. It includes a description of how long it takes, what's done with them. And it's only – DNA samples taken from arrestees are only run against the forensic unknown database, the crime scene database. They are not run – Justice Breyer, is that coming from your request for judicial notice on which we have not yet voted? Or you're saying that's part of the record that's already in the record? That's part of the record. That's the declarations of the State and Federal officials that the government put in there. They describe how DNA is used, and nowhere in there does it even suggest that it's The only indication in the record that that has ever been done in this country is in the papers by Professor Badoli, who essentially wrote the code of software for the FBI, that are attached to the Murphy Declaration, that describes how that was done by court order in Arizona. They ran their convicted offender database against itself and got a number of coincidental matches. The government is not using DNA to identify people. The reason Justice Breyer used the term identification is because he looked at what the government's doing here, and he said that is exactly what the government was doing in Rise, in Kincade, in Kreisel. In those cases, this Court called that identification. He felt bound to call identification, too, but he even specified this type of identification is not the usual type. It's also what I'm calling investigation, trying to solve unsolved crimes. There's no indication. The government couldn't have been identifying people with DNA in Kincade. Mr. Kincade had already been convicted and put on supervised release. They obviously knew who he was as the dissent, and I think as the concurrence in Kincade made clear, it wasn't being used for identification in the way the term was used. Kennedy, if I might, if I might. Can I ask a question, please? Okay. What happened here when your client was taken into custody? Is there any record of that? What did the officers say? Did the officers say, I'm placing you under arrest for violating 405A, the lynching law? What did the officers say? The record in Ms. Haskell's declaration says that the officers arrested her for that law. She has a certificate in there that says the district attorney declined to press charges. That's attached to her declaration. And they said, you must give a DNA sample under this program. No, I'm just, I want to know what happened on the street. That's not, there's nothing in this record. Well, how do we, you know, there's, from, you know, my observations and experience, you've got, you'll have an excited situation. The officer may say, well, you better get away because you're interfering with my duties. And I don't, you know, she gives him a little lip and then he arrests her. So when was the decision made to charge her with a felony? She was never charged with a felony. The police made it, the police officer who arrested her made a decision to arrest her for a felony. The district attorney's office declines to charge her with anything at all. So that decision was necessarily made. No, no, no. When he arrested her, did he tell her he was arresting her for a felony? Yes. Right there on the streets of Oakland. Yes, San Francisco. Huh? Yes. San Francisco. Sorry, Oakland. If I might. That's all it took under the statute, right, for them to ask for a DNA sample? For them to demand a DNA sample and take it by force if necessary. If I might, then really what we're saying here is that this statute is based totally on the officer determining there's probable cause or the officer determining to make an arrest, correct? Correct. And that's exactly what this appointment is. It has nothing, it has no further, no further need be done. The officer just needs to make an arrest and automatically we take DNA evidence. That's correct. Precisely. And then, as I understand expungement, as I understand it, they can't even apply for expungement until the statute of limitations is run on the crime. Isn't that correct? That's what the statute says. The government says if they have an informal procedure and it's under the statute. Well, but the statute says that's the way it is, right? Correct. But the statute also says that the expungement can't be granted if objected to by the Department of Justice or the prosecutor. Isn't that also true? Correct. So the Court has discretion, cannot grant under discretion any expungement if objected to by the prosecutor or the Department of Justice, and it's non-appealable. Correct. Also not reviewable by ribs. And none of that is like the Federal statute that was approved by Mitchell or like the Maryland statute. Isn't that also correct? That's absolutely correct. So really here we have a totally different situation than we have in anything that the Supreme Court is looking at or that another circuit has even looked at. Yes. So what is the constitutional violation here that's alleged? It's a Fourth Amendment violation? It is a Fourth Amendment violation. And what specifically do you claim or does your client claim is a Fourth Amendment violation? Is it the taking of the saliva and the swab? Is it the analyzing? Is it the databasing it? Where is the? There are at least two. Tie it into the words of the Fourth Amendment as closely as you can. There are at least two intrusions here. The taking of the swab is obviously a seizure, a seizure under the Fourth Amendment. Taking somebody's genetic tissue from them is a seizure. The analyzing of that is. Like under Schmerber or something? Yes, under Schmerber. The analyzing of it is a search. And the whole process of taking bodily tissue and analyzing it. I should say the analyzing it is a search. And Ferguson makes that clear because there was no seizure in Ferguson, but the Supreme Court says that's a search. Let me simplify the problem for you just a little bit by changing the facts just slightly, but only slightly, just to test the proposition of what's being said. You can now get DNA from all sorts of things. We leave a cookie-crumb trail of DNA just by walking into a room. And let's say that what the police do is they put you in a cell and then 24 hours later they take you out and they look for hair follicles, they look for saliva. So they don't actually take anything from you, but they sweep the place clean and get such DNA as you shed in skin cells or hair follicles or the like and store that. So I've changed the facts in the sense that they don't actually go into your body to get it. They collect it externally. Is that still a, in your view, a Fourth Amendment violation? Well, it is certainly a search. The analysis of that DNA is a search. And that's discussed in the recent Fourth Circuit case of the United States v. Davis. The government cites it in their supplemental briefing. The question there then becomes whether the DNA has been abandoned. And there are two courts in California that have looked at that issue. So it, I think it is a Fourth Amendment violation. But the question is, is that, has that DNA been abandoned? And if so, the government can search it under the abandoned property doctrine. It's clear, though, under the Fourth Circuit's decision in Davis. It's sort of like saying if you go into somebody's house and leave a fingerprint, that's a search because you haven't decided whether you've abandoned the fingerprint. I mean, isn't this sort of like that? I agree. You, I mean, to even talk about leaving behind traces of your presence as abandonment, is a little weird because that's part of living and it's part of what police count on. It's in plain view. Abandonment of DNA is a very strange concept because it's not intentional. It's not even knowing in most purposes. But what's important for this case is that that may present thorny issues under the Fourth Amendment. This case presents much more straightforward issues because we know it is a search case, it's confirmed by Ferguson, it's confirmed by Jones. A trespass into the body for the purpose of getting information is exactly what Jones was looking at. Jones, the recent Supreme Court case with GPS, was looking at trespasses of other types. But it's really a search. Let me just change the fact backwards a little from where Chief Judge Kaczynski and that is, if this statute permitted only the taking of the DNA and it couldn't be analyzed unless there were a conviction, would you have a constitutional claim if it was used solely at the outset for identification purposes? Yes. That would ameliorate some of the concerns that we have, but certainly not all of them. And, of course, that's what the Arizona Supreme Court held that that State could do. The ---- But what's the problem with that? What's the problem with taking it for identification as opposed to a fingerprint? Well, it's very different from fingerprinting. The problem is that we don't generally allow the government to seize our private information just because they say we're not going to look at it. The government can't seize and copy my private papers and say, okay, you don't have to worry about it. We'll only look at them if we get a warrant sometime in the future. That's the type of thing that I think would keep me up at night, knowing the government has my private information and could look at it at will. You can't take a picture in public. I mean, this is something that you're exposed to the world. And as you walk ---- I mean, London is a good example, because they don't have the same constitution we do. But there are towns in this ---- in the United States where cameras are becoming quite common. How is that different from saying we're going to take those pictures, and if a crime is committed, or if you get committed, we're going to sort of pull those up and see where else you've been, what else you've been up to? The clearest explanation of the difference is in footnote 2 of Justice Scalia's opinion in Kilo, where he says that it doesn't matter if the government could obtain the same information through different, less invasive means. If the government is getting information through some new technology, they have to justify that under the Fourth Amendment even if they could have got the equivalent information through some other less invasive means. So what matters is the means that they're using to get the information. Yes, the government could arguably put someone in a room, scrub it down, wait for them to leave and take the DNA sample. There would be no seizure. We would have a different case. But the fact that they can arguably do that doesn't suggest that they can also require you to be ---- submit to being swabbed to give a DNA sample. Kilo makes that very, very clear and in footnote 2, and Jones does also. Well, let's go back then on the analysis that you're talking about. DNA is a much more severe intrusion than fingerprints. Absolutely. And the analogy goes to the whole history almost of your ancestors and your weaknesses. And now we know that so-called junk DNA is very important. That's absolutely right. I don't see that reading the New York Times. As much as we love the New York Times, that's not part of the record. No. You can take judicial notice of it. At least I do. Only if you're a subscriber. I read many, many newspapers. Can we go back to this? You want to keep going back to fingerprints. Let's take fingerprints. You say in your pleadings that it is unlawful to take the DNA information that's in CODIS and investigate for past or future crimes. Correct, right? Yes. Okay. So why would that not also be true for fingerprints? Particularly, for example, if you have a fingerprint where you don't need the identification and the officer already knows the person, has known them since he went to grade school with them, and has the social security number, has everything. Or say the person has never been arrested before and it's not there. The police use fingerprints to go back and investigate past crimes, and they look for future crimes all the time, don't they, counsel? Even putting aside the privacy concerns that Judge Pragerson was just mentioning, there are three doctrinal reasons that this is different. Okay. First of all, the Supreme Court in Davis, Mississippi, Hays v. Florida, said fingerprinting is not a search. Every court that's looked at DNA extraction and sampling, including this one, has said it's a search. And under Ferguson, that's under Skinner, and even under Jones, that is undoubtedly true. You need more justification here because this is a search. Fingerprint is something less than a search. Second, as I just was mentioning, under Kylo and also under Jones, it's the means that matter. So just because the – even if the government is only getting the same information from DNA that it's getting from fingerprints, it needs to justify this new type of technology, just like it needs to justify GPS tracking. What if you could get DNA from fingerprints? That's not out of the realm of possibility, is it? You certainly cannot get it from an electronic fingerprint. As I understand it, if I take my hand and I put it right here, if you have a fingerprint with proper equipment, you can pick up DNA from that space and get the junk DNA we're talking about. That's correct, isn't it? That's what they told me it is. It's a very, very different procedure than taking it from – I get that. But the DNA is there. So if you – if the officer takes your fingerprint, rolls your finger or puts it straight down or whatever, and immediately thereafter, somebody comes and takes the DNA sample, does that create a problem for your argument? No. It creates a problem for the government because they can't put that sample into CODIS. CODIS says that that sample is not reliable enough for them to do it. In any event, it's – it would still be unconstitutional, and here's why. So – What was your – what was your third? You had three reasons. I'm about – I'm coming back to it right now. Okay. So fingerprinting has long since the beginning – this is discussed in the Murphy Declaration – has been used to track people through the criminal justice system. Who do we have? Make sure it's the same person that got arrested for this crime. Prior record of arrest, prior record of conviction, outstanding warrants. Fingerprinting as a special needs search or something less than a search is justified on that basis. Okay. Fingerprinting is not – is not unconstitutional under special needs analysis because the primary purpose is to identify people. Do you need a special need to take a fingerprint? You have a special needs. Yes. Davis, Mississippi, says you can't round up people on the street with fingerprints. But that – there was no probable cause in Davis, and that's a very different kind of a case. You cite four cases, and in none of them did – was there probable cause at all. And everybody would agree that you just can't go out on the street and take somebody's fingerprint. But show me a case that says that if you have probable cause, that your contention is correct. For fingerprints, I don't have a case. As I said, that's not a search. Whatever the government needs to that, maybe they only need reasonable suspicion to detain. It's not entirely clear from Davis and from Hayes. What is clear is that DNA sampling, analysis, and data banking is a search under the Fourth Amendment, and a search has to be justified under the Fourth Amendment. Because it's a buckleswap. I guess my point is if you can get the DNA, as the Chief suggests, if you get the DNA in some other way, and put it aside for a moment, the abandonment concept, you're really dealing with the same kind of an issue, aren't you? You've got – you say you can't use DNA for past and future investigations. People – law enforcement uses fingerprints for that all the time. All the time. That is a secondary use. However, let me quote from Kilo. It's the means that matter, not the information. Kilo says, footnote 2, The fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment. You've got just two minutes left. Huh. Maybe I should stop now. Time flies when you're having a good time. Should we stop the clock now, or do you want to keep going? Unless there are other questions, I'll save the rest of my time for rebuttal. I did want to actually make a couple – a couple points. First of all, it's important to note here that by the time the government analyzed Ms. Haskell's, Mr. Ento's sample, they had already been released from custody. They were not even going to be charged. So when the search in this – or one of the searches in this case occurred That's in the – all that's in the declaration. All that's in the declaration. Yeah. There was no – they weren't even involved in the criminal justice system. I will save the rest of my time for rebuttal. Thank you. Okay. Thank you. We'll hear from the defendants. May it please the Court. Deputy Attorney General Daniel Powell for Appalese. I'd like to start, I think, by talking about this issue of identification and fingerprints versus the DNA profile that's developed. And I think the fingerprinting is a good analogy because it's the exact same information that is obtained by the State when it develops a DNA profile versus when it collects a fingerprint. And the same standard should apply there. I think fingerprinting is a search. I think that Davis teaches us that we can't round up citizens and test their fingerprints without having arrested them for a probable cause. And the same standards applies here. Each of these individuals has been arrested upon suspicion that they have committed a felony. And just like the government – Where does the statute say arrest upon suspicion they committed a felony? Well, the statute lists qualifying – It's an arrest, don't they? Yes. It's at arrest for a felony. And it's in the mind of the policeman, isn't it not? There's no one else who decides whether there's an arrest to be made and then the DNA to be taken. Isn't that correct? Just as in fingerprinting, yes. It is the determination of the – All right. That's a little bit different than the Federal statute, isn't it? Yes, it is. Because the Federal statute, the director of FBI may not even establish the index of DNA identification unless the person has been charged in an indictment or an information with a crime. That's correct, Your Honor. I mean, that's in 14132. So here we're effectively saying that the police are more important than, in this case, even the feds go so far as the prosecutor must do something. Well, I think that California has made a determination that as part of the DNA, collecting a DNA sample at the buccal swab as part of the booking process is reasonable given the arrest. But what purpose do they – I ask the factual question of your opponent. I'd like your take on it, because in your brief, you argue that it's used for the narrow kind of identification. But that's sort of secondary. How would counsel and Justice Klein, analyzing this very statute, Prop 69, say that no, it's not used at all in California? It's not even the purpose of it. So could you clarify the record on that? Absolutely. And I think this is largely an issue of semantics. I think, you know, in evaluating the totality of the circumstances, you have to look both at the arrestee's interest and the government's interest. When we're talking about the arrestee's interest, it's clear that all we're doing is identifying. We're testing. I hear from the record. I'm sorry. What in the record makes that clear, factually, that the DNA evidence is being used for identification purposes? That's part of the statute. Well, we're talking about the facts in the record, not the statutory language. What are the facts in the record that show the DNA evidence is being used for identification as opposed to for investigation? Well, again, I'm talking about the arrestee's interest. I think when we talk about the law enforcement interest, it's both. It is both to identify, both in the narrow sense and in the broader sense, that this is not just the DNA evidence that the court used. It's also for investigatory. I mean, there is nothing about the totality of the circumstances that prohibits the government from relying on public safety and law enforcement interests. Theoretical as opposed to identified? I mean, you're making a theoretical argument, and I think we were asking you, what is there in the record that fleshes that out as a practical matter as opposed to just a theory? Well, I mean, I think that in practice, it is, because it is an initiative identity, by definition, it is identifying that arrestee. We may have to. I thought the statute required them to identify. They had to make an initial identification through fingerprint analysis. They did. Before they could take the DNA. Is that correct? In many instances, we will know the identity through the fingerprints. So what's the advantage? Why the DNA? I mean, for identity purposes, it doesn't make any sense. Well, I think, first of all, it is a way to confirm that we have the identity there. And the record reflects that it takes about 31 days. Is that correct? That's correct. In this case, somebody was just saying a minute ago that some of these plaintiffs had already been, the counsel was just saying that some of these plaintiffs had already been released before they got anything back. Right. And that's why I think the district court was correct in viewing identity as a broader concept, which includes what an individual has done, which is, as counsel conceded, is this Court's understanding of identity in Kincaid and Caruso and Rise where the Court said the government had an interest in identifying the convicted offenders. Obviously, the government knew who they were in that limited sense. And yet the Court said that they still had this interest in identification. But I think it's semantic. I think whether you call it, whether you say the government is identifying only in a narrow sense in a small number of cases, and in the larger number of cases, they know who the individual is in terms of who they've done, that doesn't change the fact that the government also has. If you define it broadly, as you suggest, then all you're allowing is the police to attempt to attempt to link someone's DNA with DNA that has been recovered from a crime scene. Absolutely. And that's just pure investigation. And that is allowed under the totality of the circumstances. I mean, this is not a special needs case where you have to look at the primary purpose. The government has not. But there's no suspicion in that. There's no basis in that. There's no probable cause or even reasonable suspicion in that circumstances. It's just a blanket search. It's a search. It's based on the fact that the arrestee has such a minimal interest, like the convicted offender, in his identity. And that's the only thing the government is taking from him. That all depends on what the police officer thinks. I mean, this is what bothers me. We don't really have the facts here. We just have generalizations. So I'm not even sure that we have a real controversy here. We have a problem with interpreting the statute. But it's that officer who's there who decides right then and there that a felony has been committed. He makes the decision. He arrests that person, takes the person to the station. And then at that point, that person, just on suspicion by the police officer, that an offense has been committed because this person here apparently interfered with his duty. So he makes that decision. And he makes that decision here on a lynching statute that is very, very, very rarely used. Now, how does that come about? I mean, isn't that a little bit crazy? No, I don't think so. I think it's the same. Did they have a lineup? Not a lineup. Did they have, when all the officers assembled, were they told there's going to be a demonstration here and, oh, we just found this section 405A, you know, and that's a felony. And if you get a couple of people coming at you, you just say I'm arresting you for a felony. Our entire law enforcement system. For conducting a lynching. Our entire law enforcement system. Did that happen here? I don't. I mean. No, I don't think there's anything to record about. Well, how did this officer know about this lynching statute? There's no instruction in Calgic on badging. I mean, Calgic on lynching, because it never comes up. Well, there's no dispute in the record. And appellants conceded that there was probable cause. But what bothers me is that that officer just decides for whatever reason that this is a felony. And then, boom, you take the woman in there. You're going to swab her. She doesn't swab her. That's another misdemeanor. If that doesn't work, they're going to force her to submit to all of this. And that's a terrible intrusion on personal privacy. And it's all done in many instances. Maybe it happened here. Well, counsel, doesn't this happen all the time, though, with respect to police officers? Police officers arrest people for felonies every day. Thousands of times a day for a variety of offenses. They don't go before a magistrate. They don't get anything special. They arrest people for this. This is the same kind of thing the statute contemplates, right? Absolutely. And I think that's just because an officer comes in and says, I'm arresting you, and I think you committed a felony. Let's go. And he books you on it.  You have to be fingerprinted. You have to be photographed. The Supreme Court recently made clear that you can be subject to a strip search, all based on the probable cause by an officer. And this is much less invasive. I mean, we're talking about Google swab. You say it's less invasive. There are two aspects to this, and maybe you could address in your answer or your discussion, address the swab aspect, and then there's what they get. What is extracted is extremely invasive. That is, even if it is only profiled with the 13 markers, the base unit is there. The entirety, as Judge Fragerson said earlier, of your whole history is now in the possession of the government. Now, with getting into the parade of horribles about 1984 and all that, when I go in and give a fingerprint, it's so common that you get fingerprinted for all sorts of reasons, job applications. I'm not leaving behind anything other than my identity for the ability to link my fingerprints to something. Now, if I'm arrested, I wind up leaving behind in the custody of the government the intimate details of my medical condition, my heritage, whatever else is in that DNA sample. The government takes out the strands, but now I've been divested of something that is quite invasive. Would you agree with that? No, I disagree, because the whole reason why DNA implicates larger privacy concerns is because of the fact that scientists could go in and look at various coding traits. But the science here, by statute, they can only look at 15 loci that are not known to code for any characteristic or trait. No, but what they are taking is bigger than that, and that's bigger and a lot, that bulk of information is much different from and more extensive than a mere fingerprint. But that is true of any biological sample. So, for instance, the urine sample that was taken in Veronia, where the school officials were analyzing it to see if the student had been using drugs, when the police take blood to see if you are, have been drinking and have what your blood alcohol level is, each of those cases, the government is also taking your DNA. And yet we're not looking at the DNA that's in the sample. We're looking at the actual search that's being done, the actual analysis. And I think in order to But here they keep the sample, right? After they do the analysis, they keep the sample. They do. There's no evidence they keep the blood after they determine that they have alcohol or they keep the urine sample. Unless there's some big store of urine somewhere. I hate to think about it, but They do keep the sample. And I'd like to explain why. They keep it both. They do keep this sample, but not the other samples. That's correct. But I still think you have to look at what the government is using the sample for. And the reason they keep, again, they're testing only those 15 loci. And the reason they keep the sample is if there is a hit to a crime scene profile, then they retest the sample to make absolutely sure that there's a match. And they also keep the sample to, as new codas loci are added, none of which code for any trait, they can retest that. So it's a continuing search. They could go back and look at everything. They want to decide to, for whatever reason, figure out whether you are That would be prohibited by statute. The statute is very clear that you cannot look at anything in that DNA that does not identify the murder. Well, that's neither here nor there. Statues change. You could have a composition. I mean, once they have it, they have it. And if constitutionally they may test it, it's just a question of what the law happens to be. You know, they could have another proposition on the ballot that now says you'll test all that stuff for everything. And as this Court said in Creasle and Kincaid, at that point the Court considered that statute. I mean, this is a facial challenge to Prop 69. And I think the Court has to look at it. Well, your argument is this is just for identification. And what's not consistent with that is they hold on to it and they do other things with it. It's one thing to say, look, we want to make sure it's really you. And so we're going to take a DNA sample because DNA samples are foolproof, unlike fingerprints and other things, and want to determine is it really, you know, this person. And at that point, we toss it. We've made that determination. That would be for identification. But all this other stuff you're talking about goes way beyond identification. No, I don't think so. So it really sort of undermines your argument this is just done for identification. No, because these other uses are still for identification. They're still, when they retest this sample. Well, you're just changing the concept of what it means, identification. Identification can just mean, no, we want to make sure it's you. And the other one, you want to say, oh, we're going to make sure it's you, and also that it's not you weren't on the scene of a rape three weeks ago or a year ago. I mean, you can call that identification, but why isn't that really investigation, not identification? Again, I think you have to look at both what we're doing, what the State is doing. Well, no, why don't you answer my question? Because for, in terms of what this, how the State is analyzing the DNA sample, it is only identification in the very narrow sense of the word. Now, what it is doing, the interest of the State. You say that, but you haven't answered my question. Identification in the narrow sense of the word is we're going to make sure it really is you, Mr. Powell, right? Right. It's really Mr. Powell. That's a narrow sense of identification. Figuring out whether Mr. Powell was in a bar last night, you know, drinking a beverage and left DNA on the glass, that's not identification. I mean, that's investigation. That is telling us something about not who you are, but what you've done. And isn't that a very different thing than figuring out who you are? And now I think you're moving to what the State's interest is in why it collects this DNA sample. And yes, investigation absolutely is one of the reasons why we have this statute. It serves vital public safety and law enforcement interests. And if we look at the other government interests, more likely to commit future criminal offenses than average citizens, it seems to me Scott destroys that. We've got that dead front in front of us. There's nothing that suggests that the sensibility to see a constitutionally relevant distinction, seeing someone convicted of a crime and someone who's just merely accused, that there's nothing to be gained there on the governmental interests. So then I go, exonerated those wrongly suspected of the criminal activity. Yes. No discretionary component. It's very discretionary. The expungement in this particular statute is absolutely discretionary with the district court. And you, the prosecutor, can say you can't do it. So how do the government interests rise to such a high level? So let me – I think there's two questions there. One is about the government interests and the one is about expungement. In terms of the government interests, I think the ACLU completely ignores why the government needs this sample at the time of arrest versus prior conviction. At arrest, we need to know if this individual is someone that can remain in society or someone who needs to be incarcerated because they're a lot more dangerous than we think. By collecting DNA at the time of arrest, we can determine if this individual who was arrested on a nonviolent drug offense is actually potentially a serial rapist and there's no way. Those decisions about keeping somebody in custody or in an army quickly, you can only keep 72 hours. They've got to be in front of a magistrate judge. Well, for under realignment, any individual who is – who cannot make bail is released after 60 days on their own recognizance. For those individuals, we will always have the DNA sample and be able to make the determination about whether they should be released. When somebody's arrested, though, they can't just – they can't remain in custody for 31 days to wait for the DNA. No. And there will be instances in which they are released before we know, but we would much rather know a month from now versus a year from now when they're convicted. The person who's been arrested has a right to make bail or to be released on his own – his or her own recognizance. That's true.  so we could – Well, we have – well, we know that they take the fingerprints, and we know from that that they get – that the police officers and the magistrate judges get certain information that allow them to make a decision about whether some – based on somebody's past criminal record about whether or not they should be held in custody or not. And this gives them more information. This gives them – it may be – it may be true that in some cases the individual is released before we have the information. But that information is not needed at that time to make that decision. I think absolutely the information is relevant to that decision. If the Court knows – if someone had – The question is it's not needed. It's not needed. I think it would be. I think it would be highly relevant if someone, for instance, if they took the fingerprints and realized that this individual's fingerprints had been left at a rape scene, I think that would be highly relevant to whether or not they keep that individual what the level they set bail at. Well, I guess, look, you said that this information is needed in order to decide whether or not somebody should remain in custody or to be released. Well, I mean, all those decisions are made very promptly in the criminal justice system. They don't – we don't wait. Well, again, for those people who are released on their own incognizance after 60 days, we do have that information. For the individuals who are released on bail, you're right. They may get out. But I would much rather know that we need to go pick this person up a month from now rather than waiting a year and a half until they're convicted. That gives them a lot longer time just because we don't have it immediately doesn't mean they have no interest. Let me ask you this. How do you reconcile your position with a case like Arizona v. Gant, where it seems to me there it probably would have been very helpful for the police to find out if that individual had committed other crimes by searching the car? And yet the Court put a very narrow limit on the kinds of searches police can conduct incident to arrest. Well, again, I think that's why it's relevant to look at the actual search and what the DNA profile the government is actually getting from the arrestee. The arrestee's only interest in the DNA sample is in his identity. It's not searching his home. It's not searching his car, where he may have a greater Fourth Amendment privacy interest. But an arrestee, as this Court has recognized, has no cognizable interest in concealing his identity from police. And since the DNA profile can only be used to establish identity, that's his only interest. And so I think Gant is completely right. But your concept of identity is much broader because your concept is it can be used to link somebody, you know, with DNA from a crime scene. When I'm talking about what the arrestee's interest is, I'm talking about a very narrow concept of identity. When you're talking about what the State uses that for, what the State's interest is, it is a broader concept of identity, or you can call it public, a public safety interest. You know, our case doesn't really recognize identity in that way. We have a more conventional understanding of identity. Well, as the district court recognized and as counsel recognized in Buccade, Creasle and Rise, the Court does have that broader understanding of identity because the Federal officials clearly knew who the individual was whose DNA they collected in Kincaid and Creasle, and yet this Court said they had an interest in identifying him. So they must have had a broader understanding of identity. But in terms of assessing the government's interest, I don't think it matters whether you call it identity or crime solving or public safety. All of those interests weigh against the arrestee's very minimal interest in the privacy of his identity. And so you can call it identity or not. I don't think it matters. Well, it's more than the privacy of his identity, you know. It's the privacy of his health and a whole host of other matters going all the way back thousands of years, the whole history on his illness. And, you know, a lot of that information goes out. And the government doesn't look at any of that. No. I mean, listen, just because the government has it doesn't mean it's going to stay there, does it? Well, absolutely. I mean, there are stringent protections within the statute. But history has taught us that it doesn't always work that way. Well, again, this is a facial challenge. And so the question is, is this statute capable of being applied constitutionally? And there is no evidence in the record that there has ever been misuse of DNA. California has had a database since 1984. We have to look at the severity of the consequences. We have to look at at least that's the way I look at it. I have to look at how did this person get in this situation. And it's all an officer who comes in and arrests someone and says, well, I'm going to make a felony out of this. And then takes them to the station. Then all this happens. Well, the individual, if the individual is not convicted, and to get back to your question about expungement, there is always the option of expungement. Yeah, but people don't follow through on it, you know. And it's discretionary. If they're privacy interested. Let me ask you this. If it's expunged and someone runs a make on them, does that arrest come up? The arrest would, but the DNA sample wouldn't. No, the arrest. Sure, but the expungement is of the DNA sample, not the arrest. No, I know, but the arrest comes up. So you don't have really an expungement. If someone's going to get a job somewhere and the employer's got a way of getting these records, which they do, and they find out, oh, you know, you were arrested for violating the law. Well, I think that's true regardless of whether there's Prop 69. I mean, that's going to be true any time someone's arrested, with or without Prop 69. Well, moving to expungement, it doesn't seem to me that in this particular situation any individual has the right to expungement at all. First of all, it's a discretionary decision by the district court, and it's unappealable. Second of all, if the State objects or the Department of Justice objects, it's absolutely it won't be expunged. You can't wait to do it until the statute of limitations has expired, and then the court has to wait 180 days after that to do it. If you look at the record at page 462 in the declaration, it talks about the DOJ's process. What Your Honor is talking about is if you go through a court process, DOJ ---- I'm talking about how we expunge something under the California statute. I read it. And that is turned to the statute. DOJ has a parallel policy where you fill out a two-page form, you attach a letter. That's in the Federal policy, correct? No. That's how the State has interpreted its statute. Again. So the State interprets its statute different than it's written? The State has authority as the manager of this databank to remove samples that otherwise don't need to be in the system. And so DOJ ---- and again, if you look at excerpts of record, page 462, we describe how the expungement process works in practice. And in practice, what we do is we have a two-page form. So under practice, and this is a facial challenge, I'm to suggest that practice is what I'm to evaluate. Well, this is a facial and an as-applied challenge. Okay. So if the statute has ---- And going to as-applied, I can understand. But as a facial argument, I don't even understand your argument. Secondly, supposing that I agree with you, I'm not sure what I'm going to do. We're only looking, first of all, when we look at an injunction, we look at likely to succeed on the merits. We've only argued about that thus far. And it seems to me that the district court really only focused on that. But what we're really talking about is a dispute of discretion when the district court focuses on likely to succeed. And we've got three other things that are pretty important. One, face irreparable harm in the absence of preliminary relief. In the face of irreparable harm, it doesn't seem to me that I can get around Mills v. District of Columbia. It's been a long time established loss of constitutional freedoms, even for minimal periods of time, unquestionably constitutes injury. Okay, so I've got pretty good injury. Balances the equities. Injunction is in the public interest. I'm trying to figure out how I can ever say the government can win on those, because I have a sliding standard here. If I have serious questions raised by the plaintiff going to the merits, then I have to show that the balance of hardship tips sharply to the plaintiff so long as the plaintiff also shows there's a likelihood of irreparable injury and it's in the public interest. In my book, the balance of equities argument for the government is very slim. What's your best policy balance of equities argument? Give me your best one other than you're going to win on likely to succeed. Well, as Chief Justice Roberts found in Maryland, there was a constant ---- Chief Justice Roberts was not looking at this particular case in Maryland. That case is totally different on how it's expunged, totally different on what's supposed to happen in the extent of expungement. He's looking at a totally different case. I'm talking about this case, California statute. But the interest California has is the same. It's the interest in solving crimes. It's the interest in ensuring that we don't release or allow to remain in society. Are we really saying? Aren't you really just arguing? Well, I'm going to go back to my balance of the equities test in the middle of the likely to succeed argument. I can't come up with a real reason why. We can't rely or we can't just put off taking this until conviction. I don't see what the government loses by putting it off until conviction. I can't see what the government loses by putting it off until a judge gets a chance to look at it. I can't see what the government puts off until it goes with the federal statute, which is at least the prosecutor gets to look at it rather than just the police look at it. What is the balance of equities that tips so sharply in the government's favor in those instances? It's the fact that the California statute, because we collected arrest, it has doubled the effective rate of the database. It allows the government to make a proper assessment of. You get more people that way. We solve more crimes. You could get more people still if you didn't require arrest. To what extent does your justification hinge on the fact that people are arrested? Remember, arrested people are presumptively innocent, and many of them don't get charged at all, are in fact innocent. But they still get fingerprinted. They still get fingerprinted. They still get photographed. I understand, and those are interesting points, but to what extent does the fact that they are arrested matter to your analysis? It matters because we need to know how to treat that individual. We need to know whether they should be entitled to bail. We need to be solving crimes. But you don't know any of those things under the system because you don't get any results for 30 days. Bail determination is made long before that. We can certainly revoke their bail if the government found out, and this is true whether it's through DNA or whether it's through any other means, that an individual who had been released on bail was likely to be involved in a rape or other violent crime, the court would certainly revoke their bail and make sure that they are in custody to serve the public safety. How many times has that happened, to your knowledge? I don't know, Your Honor. That's not in the record. Oh, no. It is speculating. This is – I mean, again, this is off a preliminary injunction, so the record on that basis is not. No, no, I understand. But you haven't answered my question. To what extent does it matter that they have been arrested? What if the next proposition on the ballot says anybody who turns 21 will get – has to deliver a DNA sample at birth? You know, if you're in the delivery room, they swap down the baby and, well, you know. I'm not saying it's necessary, but may I answer your question? You must. I think – You don't have a choice. It's not a – No, I think that in those situations, those individuals have a substantial interest in the privacy of their identity. Arrestees are presumptively innocent people. But they don't have an interest in the privacy of their identity. There's a whole host of things a State can do to an arrestee. So arrestees don't have an interest in their privacy or identity, whereas people who are not arrested do have an interest in their identity? Absolutely. An arrestee does not have an interest in concealing his identity from police officers. Okay. All right. I don't know about that. And what says that? What is the citation you give me for that? I don't have a – Just a – Kincaid – Sorry. Kincaid-Kreisel-Wise. I had a case like that once, and they just booked her under Jane Doe. And she never did tell him who she was. I think that the court in Kincaid and Rise just – He told me, but I kept it in confidence. Brinehart's dissent in Kincaid all recognize that there is a – that the arrestee does not have an interest in concealing his identity at arrest. Okay. Thank you. Thank you. I think, Rutherford, you have two minutes left. Thank you. I'll abandon my speeches. A couple of facts. First of all, identity. This Fourth Amendment right should not turn on just linguistic games. If the police detain or arrest me, they can make me identify myself as Michael Risher. That's not what's going on here. They cannot make me identify myself as the guy who killed Jimmy Offa or robbed a bank or did anything else. That's not identification. Offa is dead? How do you know that, Rutherford? Maybe I said too much already. Maybe it needs to be investigated, and that's what they're doing here. This is about investigation, not identification. We've been talking about 31 days. As the RAND report, page 11 of 32, makes clear, confirmation of a hit, getting the actual name, takes an additional 4 to 6 weeks. We're not just taking 31 days. Counsel, doesn't the record also show that it can happen as early as 4 days after the initial take? The record shows that the actual process, if they're doing it in batches, takes about a week. Yes, if they specially do a case, they can do it in 4 days, but they're not specially doing cases. This is mass arrest. I understand that in this case, they're not doing it, but the technology is there. It's just a question of prioritizing. If they needed to get this stuff in 2 days, 3 days, they could do it. If they needed to get this stuff done in a couple of days, they could get a warrant. Right. Plenty of time to get a warrant. Your argument changed if the reason that the identification was done was to determine whether it matched an outstanding warrant, which was obtained solely on the basis of a DNA identification and didn't even list the name of the wanted person. Would the State have an interest? The State would certainly have an interest. That would still be investigation if they used it to match to a DNA warrant. They're not doing that. And that's the type of polygraph. Well, there are warrants issued. Oh, absolutely. Based on DNA. But CODIS does not, CODIS cannot do that. CODIS can hook you up with a crime scene. Indirectly, that might lead to a DNA warrant. But it's still, the way they would be achieving that goal is a law enforcement collection of evidence. And Ferguson, pages 82 to 84, makes it clear, even if their ultimate goal were something different from law enforcement, and, of course, the prosecution is law enforcement, that wouldn't matter. What matters is they're doing the crime. But Ferguson said different from matching his fingerprints against the prints of a person for whom an outstanding warrant of arrest exists. Because under Kilo, the means matter. And if they can do it through some other means, if they can collect a DNA sample surreptitiously, that's a different case. What they're doing here is forcing people to submit to a search and a seizure of their bodily tissue of their genetic blueprint. The means matters. Alito, I also thought you heard, I heard an argument that the second search, which is the match, is also unconstitutional. Isn't that your position? Yes. The whole, you can break it down. I think under Jones, the proper analysis is to look at it as one big search. But the search of the DNA is unconstitutional. If you put it all together, you have one big search under Jones. That's unconstitutional under the Fourth Amendment. So every time we run a search of a known set of fingerprints against latent fingerprints that were taken at crime scenes, that's unconstitutional as well? No, because that's not. The second search is the analysis of the DNA to pull out the profile. But you have to analyze the prints, too, don't you? Somebody, some fingerprint examiner has to sit down and determine whether the ridges from the latent print match the ridges from the known fingerprint. But as the Supreme Court made clear in Davis and in Hayes, that is not, that doesn't involve the probing that characterizes a search. That's something less than a search. It's done automatically now. So, yes, again, it might be possible to get similar information, but it's clear fingerprinting isn't a search. This is a new technology. The government has to justify it. Thank you. May I mention a couple of factual findings? Or should I sit down? Very quickly. Record of 15, no evidence has been presented that arrestees are more likely to commit crimes than anybody else. The rest of it I will save for a different day. Thank you very much. Thank you. Court is adjourned.
judges: Kozinski, Pregerson, McKeown, Fisher, Gould, Paez, Tallman, Rawlinson, Smith, Smith, Watford